[No. G034640. Fourth Dist., Div. Three. Nov. 3, 2005.]

RLH INDUSTRIES, INC., Plaintiff and Appellant, v.
SBC COMMUNICATIONS, INC., et al., Defendants and Respondents.

COUNSEL

Richard S. Price II and H. Kenneth Kudon for Plaintiff and Appellant.

Pillsbury Winthrop, Kevin M. Fong, Douglas R. Tribble, Connie J. Wolfe; Tucker Ellis & West, Michael C. Zellers and Lawrence A. Callaghan for Defendants and Respondents.

OPINION

IKOLA, J.—RLH Industries, Inc. (RLH), appeals from summary judgment granted to defendants SBC Communications Inc. (SBC), and Pacific Bell Telephone Company (PacBell). RLH alleged the defendants violated California antitrust law by requiring their local telephone service customers to obtain high voltage protection (HVP) from defendants or, in PacBell's case, from approved HVP device makers other than RLH. RLH contended defendants' HVP policies constituted an illegal tying arrangement impairing its ability to compete in the HVP market.

We conclude the court correctly granted summary judgment to PacBell. RLH failed to raise a triable issue as to whether PacBell illegally tied its HVP service to its local telephone service, because the undisputed evidence showed PacBell offered its customers a choice between leasing PacBell's HVP services or buying their own HVP devices from two independent suppliers. Since PacBell's HVP policy does not threaten competition, the court correctly granted summary judgment to PacBell.

On the other hand, we conclude the court erred in granting summary judgment to SBC. A triable issue exists as to whether SBC perpetrated an illegal tying arrangement; the evidence tended to show SBC's midwest subsidiary required its customers to lease its HVP services in order to receive local telephone service, and prohibited customers from buying their own HVP devices. We cannot say, on the existing record and as a matter of law, this policy does not constitute an illegal tying arrangement.

We reject the only two grounds SBC asserts for affirming its judgment. First, SBC contends it is not liable for its subsidiaries' HVP policies, but SBC failed to show the nonexistence of triable issues as to whether it is liable under an alter ego or agency theory. Second, SBC contends the commerce clause of the United States Constitution limits California law to regulating in-state conduct. We conclude the commerce clause does *not* bar application of California antitrust law to out-of-state anticompetitive conduct that causes

injury in California. Accordingly, we affirm the summary judgment in favor of PacBell, and reverse summary judgment in favor of SBC.

## FACTS

■ In reviewing summary judgment in favor of SBC and PacBell, we "view the evidence in a light favorable to [RLH] as the losing party [citation], liberally construing [its] evidentiary submission while strictly scrutinizing defendants' own showing, and resolving any evidentiary doubts or ambiguities in [RLH's] favor." (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768 [107 Cal.Rptr.2d 617, 23 P.3d 1143] (*Saelzler*).)

SBC's subsidiaries provide local telephone service. SBC subsidiary PacBell provides local telephone service in California. SBC subsidiary Ameritech Corporation (Ameritech) provides local telephone service in Illinois, Ohio, Michigan, Wisconsin, and Indiana (the Midwest region). Other SBC subsidiaries provide local telephone service in seven other states.

RLH is a California company with its principal place of business in Orange, California. It makes HVP devices, which protect telephone lines against hazardous voltages arising from ground potential rise (GPR) caused by lightning or voltage surges. Only three other North American companies manufacture HVP devices: Positron Industries (Positron), SNC Manufacturing Co. (SNC), and Westell Technologies, Inc.

PacBell and Ameritech require their local telephone service customers at sites exceeding 1,000 GPR, like utility companies, to use HVP devices. The two companies have different HVP policies.

PacBell offers its customers a choice between leasing HVP services from PacBell, or buying and installing their own HVP devices. Customers who lease HVP protection from PacBell sign 20-year leases containing "mixed use" provisions, which require customers who later want to install their own HVP devices to pay a termination fee and replace any existing PacBell-installed HVP devices. Customers who install their own HVP devices must buy them from PacBell-approved suppliers. PacBell generally approves Positron and SNC devices for use throughout the state. PacBell generally approves RLH devices for use by Northern California customers, but only sporadically approves RLH devices in certain Southern California areas. PacBell requires all its customers at locations with GPR exceeding 20,000 to use RLH devices.

Ameritech requires its customers to lease its HVP service. Customers cannot install their own HVP devices. Ameritech installs only Positron's devices, except it uses RLH's devices at sites where GPR exceeds 20,000.

RLH sued SBC and PacBell over their HVP policies, alleging defendants illegally used their market power in the local telephone service market to "tie" customers into leasing HVP services from them. In the operative second amended complaint, RLH asserted causes of action for Cartwright Act violations, unfair competition, and intentional interference with prospective economic advantage. The court granted summary judgment to defendants, holding the HVP policies did not constitute tying arrangements.

## DISCUSSION

To obtain summary judgment, defendants must show an element of each of RLH's causes of action cannot be established, or show a complete defense thereto. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 [107 Cal.Rptr.2d 841, 24 P.3d 493] (*Aguilar*).) They bear the burden to "make a prima facie showing of the nonexistence of any triable issue of material fact." (*Ibid.*) If they do so, RLH must show some triable issue of material fact does exist. (*Ibid.*) On appeal, "we must independently examine the record to determine whether triable issues of material fact exist." (*Saelzler, supra,* 25 Cal.4th at p. 767.)

*No Evidence Suggests PacBell Unlawfully Tied HVP Protection to Its Telephone Service*

RLH alleges PacBell's HVP policy violates California's antitrust law, the Cartwright Act (Bus. & Prof. Code, § 16720, subd. (a)), by constituting a tying arrangement. "A tying arrangement is 'a requirement that a buyer purchase one product or service as a condition of the purchase of another. [Citation.] Traditionally the product which is the inducement for the arrangement is called the "tying product" and the product or service that the buyer is required to purchase is the "tied product." ' " (*Morrison v. Viacom, Inc.* (1998) 66 Cal.App.4th 534, 540–541 [78 Cal.Rptr.2d 133] (*Morrison*).)

"The elements of a per se tying arrangement violative of [Business and Professions Code] section 16720 are: '(1) a tying agreement, arrangement or condition existed whereby the sale of the tying product was linked to the sale of the tied product or service; (2) the party had sufficient economic power in the tying market to coerce the purchase of the tied product; (3) a substantial amount of sale was affected in the tied product; and (4) the complaining party sustained pecuniary loss as a consequence of the unlawful act.' " (*Morrison, supra,* 66 Cal.App.4th at pp. 541–542.)

Although the parties dispute each element, RLH's lack of evidence tending to show the first element—a tying arrangement—is dispositive. The undis-

puted evidence showed PacBell does not "link" its telephone service to its HVP service. Rather, its customers have a choice among competitors. They can choose to lease PacBell's HVP service, or buy and install their own HVP devices from Positron or SNC. PacBell does not "tie" its HVP service to its telephone service merely by packaging them together, because its customers can choose to buy telephone service and HVP service separately, from different parties. (See *Northern Pac. R. Co. v. United States* (1958) 356 U.S. 1, 6, fn. 4 [2 L.Ed.2d 545, 78 S.Ct. 514] (*Northern Pacific*) ["Of course where the buyer is free to take either product by itself there is no tying problem even though the seller may also offer the two items as a unit at a single price"]; see also *Jefferson Parish Hosp. Dist. No. 2 v. Hyde* (1984) 466 U.S. 2, 12 [80 L.Ed.2d 2, 104 S.Ct. 1551] ["Buyers often find package sales attractive; a seller's decision to offer such packages can merely be an attempt to compete effectively—conduct that is entirely consistent with" antitrust law].)[1]

For PacBell's HVP policy to constitute an illegal tie, RLH must show PacBell had a direct financial interest in the other HVP providers. (See *Suburban Mobile Homes, Inc. v. AMFAC Communities, Inc.* (1980) 101 Cal.App.3d 532, 543 [161 Cal.Rptr. 811] [mobilehome park illegally tied home sales to home sites by requiring customers to purchase homes from suppliers who paid commissions to the park]; *Carl Sandburg Village Condo. Ass'n v. First Condo.* (7th Cir. 1985) 758 F.2d 203, 207 (*Carl Sandburg*) ["an illegal tying arrangement will not be found where the alleged tying company has absolutely no economic interest in the sales of the tied seller, whose products are favored by the tie-in"].) But no evidence suggests PacBell has any such direct financial interest in Positron or SNC. Positron did give free training for its HVP devices to PacBell, but it is undisputed that Positron offers the same free training to all its current and potential customers, whether they buy its HVP devices or not. The free training is not a direct financial interest in Positron.

As an alternative theory, RLH asserts PacBell need not have an interest in the approved suppliers, because it unreasonably withheld approval of RLH devices. RLH relies on *Tic-X-Press, Inc. v. Omni Promotions Co. of GA.* (11th Cir. 1987) 815 F.2d 1407, 1416 (*Tic-X-Press*), which states: "Where a contract . . . provides that buyers shall use only the seller or a source 'approved' by the seller to purchase the tied product, the courts have looked

---

[1] When reviewing alleged tying agreements, California courts may seek guidance from federal law construing the Sherman Antitrust Act, which also prohibits tying agreements. (*Morrison, supra*, 66 Cal.App.4th at p. 541.)

to see if the approval clause was reasonable and permitted the buyer meaningful freedom of choice, or whether it is manipulated by the seller to force the buyer to purchase the tied product from the seller." RLH contends PacBell manipulated customers into leasing its HVP service by unreasonably denying them the option of using RLH's purportedly superior HVP devices.

But *Tic-X-Press* offers no help to RLH, because it does not eliminate the direct financial interest requirement. The defendant and the approved supplier in that case were "under common ownership and management and essentially function[ed] as a single entity." (*Tic-X-Press, supra,* 815 F.2d at p. 1411.) And the cases on which *Tic-X-Press* relies expressly endorse the direct financial interest requirement. (*Midwestern Waffles, Inc. v. Waffle House, Inc.* (11th Cir. 1984) 734 F.2d 705, 712 ["Only if a franchisee is coerced into purchasing products from a company in which the franchisor has a financial interest does an illegal tie exist"]; *Kentucky Fried Chicken v. Diversified Packaging* (5th Cir. 1977) 549 F.2d 368, 378 ["When the victim of an alleged tie-in is not required to buy a single unit of the tied product from the tying party or from any source in which the tying party has an interest or on whose sales the tying party earns a commission, the arrangement simply does not constitute a tie"].)

As a final fallback, RLH contends PacBell's "mixed use" policy constitutes a tying arrangement. This policy forbids customers who lease PacBell's HVP services from later installing their own HVP devices without first replacing all PacBell-installed HVP devices and paying a hefty termination charge. RLH contends the lease terms dissuade PacBell's HVP customers from switching to RLH devices, thus impairing competition. But this policy preserves competition because PacBell's customers may avoid the purportedly onerous lease terms by choosing to buy their own HVP devices at the outset. (Cf. *Queen City Pizza, Inc. v. Domino's Pizza, Inc.* (3d Cir. 1997) 124 F.3d 430, 440 [no tying agreement where "the Domino's franchisees could assess the potential costs and economic risks [of an approved-supplier requirement] at the time they signed the franchise agreement"].) No evidence suggests PacBell imposed the mixed use policy on customers only after they "locked in" to leasing its HVP services. (Cf. *Eastman Kodak Co. v. Image Technical Services Inc.* (1992) 504 U.S. 451, 476–477 [119 L.Ed.2d 265, 112 S.Ct. 2072].)

■ In short, RLH overlooks that the antitrust law is "concern[ed] with the protection of *competition,* not *competitors.* . . ." (*Brown Shoe Co. v. United States* (1962) 370 U.S. 294, 320 [8 L.Ed.2d 510, 82 S.Ct. 1502].) ■ PacBell's HVP policy protects competition by allowing customers to choose between leasing its HVP services or buying their own HVP devices

from two suppliers in whom PacBell has no direct financial interest. PacBell's decision not to approve RLH devices as often as RLH would like may harm RLH as an individual *competitor*, but it does not harm *competition*.

*PacBell's HVP Policy Is Not Unfair or Independently Wrongful*

Having properly granted PacBell summary judgment on the Cartwright Act causes of action, the court also properly granted PacBell summary judgment on the unfair competition cause of action. (Bus. & Prof. Code, § 17200 (§ 17200).)

RLH contends PacBell's HVP policy may constitute an unfair business practice, even if it does not violate the Cartwright Act. RLH relies on *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163 [83 Cal.Rptr.2d 548, 973 P.2d 527] (*Cel-Tech*), which defined "unfair" as "conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." (*Id.* at p. 187.) RLH claims PacBell's HVP policy need not be a "full-blown" antitrust violation to be deemed "unfair."[2]

Even if so, nothing suggests PacBell's HVP policy "threatens an incipient violation" of the Cartwright Act, violates its policy or spirit, or otherwise threatens competition. (*Cel-Tech, supra,* 20 Cal.4th at p. 187.) RLH did not nip an illegal tying arrangement in the bud. PacBell's HVP policy does not risk harming competition because it allows customers to choose between leasing its HVP services or buying HVP devices from two independent suppliers. Even if some unfair competition causes of action can survive independently of an actual antitrust violation, this one does not. (See *Chavez v. Whirlpool Corp.* (2001) 93 Cal.App.4th 363, 375 [113 Cal.Rptr.2d 175] ["If the same conduct is alleged to be both an antitrust violation and an 'unfair' business act or practice for the same reason—because it unreasonably restrains competition and harms consumers—the determination that the conduct is not an unreasonable restraint of trade necessarily implies that the conduct is not 'unfair' toward consumers"].)

■ In the same vein, RLH's intentional interference with economic advantage cause of action against PacBell fails. "[A] plaintiff seeking to recover for alleged interference with prospective economic relations has the

---

[2] RLH also contends Positron's free training is an unfair "kickback." But Positron offers its training to any current or prospective customer, without requiring recipients to buy its devices. There is nothing unfair about that.

burden of pleading and proving that the defendant's interference was wrongful 'by some measure beyond the fact of the interference itself.'" (*Della Penna v. Toyota Motor Sales U.S.A., Inc.* (1995) 11 Cal.4th 376, 392–393 [45 Cal.Rptr.2d 436, 902 P.2d 740].) "[A]n act is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard." (*Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1159 [131 Cal.Rptr.2d 29, 63 P.3d 937].) PacBell's HVP policy violates no determinable legal standard, is not independently wrongful, and cannot support RLH's intentional interference cause of action.

*SBC Was Not Entitled to Summary Judgment*

Although the court properly granted summary judgment to PacBell, it erred in granting summary judgment to SBC. SBC does not argue its subsidiaries' HVP policies do not constitute a tying arrangement. As will be seen, SBC made the right tactical decision in directing its efforts elsewhere. Triable issues exist on that point.

Rather, SBC defends its summary judgment on two grounds the court did not reach: (1) it is not liable for its subsidiaries' HVP policies; and (2) the commerce clause restricts California law to regulating in-state conduct. The parties thoroughly briefed both issues below and on appeal; we require no additional briefing. We conclude SBC failed to show the nonexistence of triable issues as to its liability for its subsidiaries' HVP polices, and its commerce clause argument misses the target.

A *Triable Issue Exists as to Whether SBC Is Liable for Its Subsidiaries' HVP Policies*

SBC failed to meet its summary judgment burden of making a prima facie showing no triable issue exists as to whether it is liable for its subsidiaries' HVP policies. Whether SBC is liable under either an agency or alter ego theory is a question of fact. (*Las Palmas Associates v. Las Palmas Center Associates* (1991) 235 Cal.App.3d 1220, 1248 [1 Cal.Rptr.2d 301] [alter ego]; 2 Witkin, Summary of Cal. Law (9th ed. 1987) Agency, § 37, p. 50 [agency].) The only evidence SBC offers to show no triable issue exists as to these theories is the declaration of an SBC officer averring that SBC and PacBell are separate entities with separate boards of directors. The declaration says nothing about the relationship between SBC and its other subsidiaries, such

as Ameritech. It lacks any value in showing no triable issues exist as to whether these subsidiaries are SBC's agents or alter egos. SBC thus failed to shift the burden of production on the agency and alter ego theories to RLH, and is not entitled to summary judgment on this ground.[3] (*Aguilar, supra,* 25 Cal.4th at p. 850.)

*The Commerce Clause Does Not Bar California's Antitrust and Unfair Competition Law from Reaching Out-of-State Conduct Injuring California Residents*

■ SBC contends the commerce clause bars RLH's claims because California law cannot reach SBC's business practices in other states. "The commerce clause of the federal Constitution delegates to Congress the power '[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes.' (U.S. Const., art. I, § 8, cl. 3.) This explicit grant of power has been interpreted as an implied limitation on the power of states and local government to adopt statutes, regulations and ordinances that burden or interfere with interstate commerce. [Citation.] Known as the 'dormant' or 'negative' commerce clause [citation], this limitation has been characterized as 'predicated upon the implications of the commerce clause itself, [citations], or upon the presumed intention of Congress, where Congress has not spoken . . . .'" (*County Sanitation Dist. No. 2 v. County of Kern* (2005) 127 Cal.App.4th 1544, 1608 [27 Cal.Rptr.3d 28].)

SBC contends the commerce clause sets a strict geographical limit on the reach of state law. According to SBC, California statutes such as the Cartwright Act and section 17200 cannot reach anticompetitive practices in other states, even if they cause injury in California.

■ SBC relies largely on *Healy v. Beer Institute* (1989) 491 U.S. 324 [105 L.Ed.2d 275, 109 S.Ct. 2491] (*Healy*). In *Healy*, the United States Supreme Court set forth a "distillation of principles" regarding "the extraterritorial effects of state economic regulation." (*Id.* at pp. 336, 337, fn. 14.) The first principle is that the " 'Commerce Clause . . . precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State . . . .' "

---

[3] We do not consider the SBC marketing material and Internet web pages that RLH cites in its appellate briefs, because RLH did not offer that material in opposition to SBC's summary judgment motion. (Code Civ. Proc., § 437c, subd. (c) [summary judgment motions are decided on "all the evidence set forth in the papers"].)

(*Id.* at p. 336.) SBC embraces this statement without hesitation, and uncritically asserts it bars RLH's claims.[4]

We cannot blindly wield the principle SBC cites without taking a closer look at the issue actually decided in *Healy*. *Healy* was the high court's "fourth expedition into the area of price-affirmation statutes." (*Healy, supra,* 491 U.S. at p. 331.) It reviewed a Connecticut statute requiring out-of-state beer shippers to affirm they charged the same prices in Connecticut as in neighboring states. (*Id.* at p. 324.) It relied upon or discussed previous cases reviewing price-affirmation and price-setting statutes. (See *Baldwin v. G.A.F. Seelig, Inc.* (1935) 294 U.S. 511 [79 L.Ed. 1032, 55 S.Ct. 497]; *Joseph E. Seagram & Sons, Inc. v. Hostetter* (1966) 384 U.S. 35 [16 L.Ed.2d 336, 86 S.Ct. 1254], disapproved in *Healy, supra,* 491 U.S. at p. 343; *United States Brewers Ass'n, Inc. v. Healy* (2d Cir. 1982) 692 F.2d 275; *Brown-Forman Distillers Corp. v. N.Y. Liquor Auth.* (1986) 476 U.S. 573 [90 L.Ed.2d 552, 106 S.Ct. 2080] (*Brown-Forman*).) It therefore focused on the commerce clause's prohibition against state laws controlling retail prices in other states. The principle that SBC cites—and always redacts with an ellipsis—goes on to say, "and, specifically, a State may not adopt legislation that has the practical effect of establishing 'a scale of prices for use in other states.' " (*Healy, supra,* 491 U.S. at p. 336.)

*Healy* was *not* specifically concerned with the extraterritorial application of state antitrust laws. It did not review any such law, and it adopted the principle SBC cites from a non-antitrust case (*Edgar v. MITE Corp.* (1982) 457 U.S. 624 [73 L.Ed.2d 269, 102 S.Ct. 2629] [Illinois law requiring registration of takeover bids]), which in turn cited another non-antitrust case (*Southern Pacific Co. v. Arizona* (1945) 325 U.S. 761 [89 L.Ed. 1915, 65 S.Ct. 1515] [Arizona law limiting train length].)

That *Healy* did not specifically consider state antitrust laws is important, because its understanding of the commerce clause's purpose and scope may be consistent with giving extraterritorial effect to those laws. As for the commerce clause's purpose, *Healy* states, "the Commerce Clause

---

[4] SBC also relies on *In re Brand Name Prescription Drugs* (7th Cir. 1997) 123 F.3d 599. But there, the court held federal antitrust law did *not* preempt state antitrust law, and directed the federal district court to remand the plaintiff's state law antitrust claims to the state court. (*Id.* at pp. 611–613.) The phrase SBC pulls from the case—"A state cannot regulate sales that take place wholly outside it. [Citation.] State *A* cannot use its antitrust law to make a seller in State *B* charge a lower price to a buyer in *C*"—is dicta. (*Id.* at p. 613.) Moreover, it does not reflect the allegations in this case. RLH seeks to use State A's antitrust law to make a competitor in State B stop anticompetitive practices that cause injury in State A.

protects against inconsistent legislation arising from the projection of one state regulatory regime into the jurisdiction of another State." (*Healy, supra,* 491 U.S. at pp. 336–337.) The state laws SBC challenges here cannot create any inconsistency by projecting California's prohibition of tying arrangements into other states, because the Sherman Act already bars tying arrangements throughout the land. (See *Northern Pacific, supra,* 356 U.S. at p. 7; see also *R.E. Spriggs Co. v. Adolph Coors Co.* (1974) 37 Cal.App.3d 653, 659 [112 Cal.Rptr. 585] ["the Cartwright Act . . . is complementary to the relevant provisions of the federal antitrust statutes"].)

■ As for the commerce clause's scope, *Healy* notes, "the critical consideration in determining whether the extraterritorial reach of a statute violates the Commerce Clause is the overall effect of the statute on both local and interstate commerce." (*Healy, supra,* 491 U.S. at p. 337, fn. 14.) *Healy* concedes its "distillation of principles," including the principle SBC cites, "is meant as nothing more than a restatement of those specific concerns that have shaped this inquiry." (*Ibid.*) *Healy* cites *Brown-Forman, supra,* 476 U.S. 573, for these propositions, which in turn cites *Raymond Motor Transp., Inc. v. Rice* (1978) 434 U.S. 429, 440–441 [54 L.Ed.2d 664, 98 S.Ct. 787] (*Raymond Motor*). This leads to two conclusions.

■ First, the principle SBC cites restates the "specific concerns" that *price-affirmation statutes* have raised under the commerce clause. (*Healy, supra,* at p. 337, fn. 14.) The principle does *not* replace a "sensitive consideration of the weight and nature of the state regulatory concern in light of the extent of the burden imposed on the course of interstate commerce." (*Raymond Motor, supra,* 434 U.S. at p. 441.)

■ Second, the commerce clause's primary concern is not geographic, but practical. It focuses on the balance between the state law's benefits to local commerce and its burdens upon interstate commerce, not simply on the location of the challenged conduct. (*Raymond Motor, supra,* 434 U.S. at p. 441, citing *Pike v. Bruce Church, Inc.* (1970) 397 U.S. 137, 142 [25 L.Ed.2d 174, 90 S.Ct. 844] (*Pike*) ["Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits"].)

Thus, we cannot give *Healy* the same uncritical reading that SBC gives it. It is not clear that *Healy* necessarily bars state antitrust and unfair competition laws from reaching anticompetitive conduct occurring in other states,

regardless of its effects on local residents. Although *Healy* distilled commerce clause jurisprudence to a few general principles for reviewing price affirmation statutes, it left the basic consideration of commerce clause jurisprudence intact: Taking everything into account, does the state law unreasonably burden interstate commerce? This calls for a fact-intensive balancing analysis—what *Raymond Motor* calls a " 'delicate adjustment' " and "sensitive consideration"—not slogans and broad strokes. (*Raymond Motor, supra,* 434 U.S. at pp. 440–441; accord, *Pike, supra,* 397 U.S. at p. 142.) SBC has not attempted to carefully balance the benefits of applying California law to their alleged out-of-state tying arrangements against the burden that condemning the tying arrangements under California law—which appears to be consistent with federal law; SBC notes no inconsistency—would impose on interstate commerce. (See *Pike, supra,* 397 U.S. at p. 142.) We decline to do so for it.[5]

We conclude that the commerce clause, even as construed in *Healy,* does not necessarily prohibit state antitrust and unfair competition law from reaching out-of-state anticompetitive practices injuring state residents. No California case appears to be squarely on point. SBC cites *Diamond Multimedia Systems, Inc. v. Superior Court* (1999) 19 Cal.4th 1036 [80 Cal.Rptr.2d 828, 968 P.2d 539] (*Diamond Multimedia*), but that case held only that the commerce clause does *not* bar nonresidents from invoking California securities law against California companies. (*Id.* at pp. 1063–1064.) This falls far short of holding California antitrust law does not protect California residents from out-of-state anticompetitive conduct causing harm here.[6]

Our conclusion is bolstered by decisions from other jurisdictions. A federal district court held *Healy* does not bar application of Illinois' antitrust law to an out-of-state price-fixing scheme injuring an Illinois insurance company. (*In re Lorazepam & Clorazepate Antitrust Litigation* (D.D.C. 2003) 295 F.Supp.2d 30.) The court cited the same principle from *Healy* that SBC relies upon, but also cited *Pike*'s balancing test. (*Id.* at pp. 48–49.) It found that "the scope of the Illinois Antitrust Act does not directly conflict with that of the Sherman Act" (*id.* at p. 49), and held that "the Illinois Antitrust Act extends not only to illegal antitrust activity that occurs wholly within Illinois,

[5] Even if we wanted to conduct a *Pike* balancing analysis for SBC, the record SBC developed for summary judgment would not allow us to do so at this time.

[6] The *Diamond Multimedia* court further noted that the California securities law in question permitted the same recovery already "allowed under federal securities law and we are unable to see how permitting [such] recovery under [California law] imposes any burden on interstate commerce. Quite the opposite." (*Diamond Multimedia, supra,* 19 Cal.4th at p. 1063.) Similarly here, both California and federal law bar tying arrangements.

but also to activity which may have effects in that state and which may have occurred, in part, outside of Illinois." (*Id.* at p. 48.) *Healy* was not dispositive.

Two other post-*Healy* federal courts have concluded California's antitrust and unfair competition laws can reach extraterritorial conduct causing injury in California, but without discussing *Healy*. (*Knevelbaard Dairies v. Kraft Foods, Inc.* (9th Cir. 2000) 232 F.3d 979, 993–994 [Cartwright Act reached Wisconsin price-fixing conspiracy artificially depressing prices in California, rejecting commerce clause argument]; *Churchill Village, L.L.C. v. General Elec. Co.* (N.D.Cal. 2000) 169 F.Supp.2d 1119, 1126–1127 [even though "California law embodies a presumption against the extraterritorial application of its statutes," California residents injured by out-of-state conduct could assert § 17200 claims against nonresident defendants].)

Other states have applied their antitrust laws to out-of-state conduct injuring their residents. In *Heath Consultants v. Precision Instruments* (1995) 247 Neb. 267 [527 N.W.2d 596] (*Heath*), the Supreme Court of Nebraska allowed a nonresident company to assert a state law antitrust claim against another nonresident company for an alleged tying arrangement perpetrated outside of Nebraska, but which ultimately affected Nebraska consumers. The *Heath* court rejected the defendant's commerce clause argument, concluding, "Inasmuch as the Nebraska act is consistent with federal law and there are ultimate inferences that the tying arrangement . . . had an impact upon local residents, the burden on interstate commerce cannot, at least at this point, be said to outweigh the interest of this state." (*Id.* at p. 607.) We could say the same here.

 As a leading antitrust commentator observed, "no one doubts that state courts can reach persons located outside the forum state, or that state legislatures have the authority to condemn certain acts that take place outside the state." (Hovenkamp, *State Antitrust in the Federal Scheme* (1983) 58 Ind. L.J. 375, 376, fn. omitted.) Because "[t]here is no evidence that Congress has ever wanted to prohibit extraterritorial assertions of state antitrust law," it follows that "the commerce clause does not limit substantially a state's power to apply its antitrust law to an out of state price-fixing conspiracy." (*Id.* at pp. 400–401.)

The weight of this authority leads us to reject SBC's contention the commerce clause prevents California antitrust and unfair competition law from reaching its allegedly anticompetitive HVP policies in other states,

despite their effects on RLH. We conclude SBC failed to meet its summary judgment burden of showing a complete defense to RLH's complaint. (*Aguilar, supra,* 25 Cal.4th at p. 850.)

■ On the other hand, we stop short of endorsing RLH's claim that because SBC concedes personal jurisdiction, no issues arise from applying California law to SBC's out-of-state conduct. To be sure, the inquiries share a family resemblance. "The limits on a State's power to enact substantive legislation are similar to the limits on the jurisdiction of state courts. In either case, 'any attempt "directly" to assert extraterritorial jurisdiction over persons or property would offend sister States and exceed the inherent limits of the State's power.' " (*Edgar v. MITE Corp., supra,* 457 U.S. at p. 643.)

The propriety of applying California law to out-of-state conduct involves issues beyond personal jurisdiction, or even the commerce clause. These issues may include, without limitation, legislative intent, due process, and conflict of laws. (*Norwest Mortgage, Inc. v. Superior Court* (1999) 72 Cal.App.4th 214, 222–227 [85 Cal.Rptr.2d 18] [legislative intent and due process]; *Washington Mutual Bank v. Superior Court* (2001) 24 Cal.4th 906, 919–920 [103 Cal.Rptr.2d 320, 15 P.3d 1071] [due process and choice-of-law].) Because SBC did not raise these issues below or on appeal, it waived them as a basis for affirming summary judgment. (*AICCO, Inc. v. Insurance Co. of North America* (2001) 90 Cal.App.4th 579, 595 [109 Cal.Rptr.2d 359] [respondent waived choice-of-law issue by not analyzing it].) The conflict of law or due process issues may in turn require an in-depth analysis of the legal effect of the tariffs that SBC has filed with various state agencies. (See *City of Anaheim v. Pacific Bell Telephone Co.* (2004) 119 Cal.App.4th 838, 843–846 [14 Cal.Rptr.3d 725] [court lacked jurisdiction to hear tariff-based dispute over which Public Utility Commission had exclusive jurisdiction]; see also *Phonetele, Inc. v. American Tel. & Tel. Co.* (9th Cir. 1981) 664 F.2d 716, 733–737 [federal and state tariffs did not immunize telephone companies' tying arrangements from antitrust scrutiny].) SBC mentioned the tariff issue only in a footnote with a single citation to *Healy*, and thus failed to offer the comprehensive legal analysis needed to affirm summary judgment on this ground. (See *In re Keisha T.* (1995) 38 Cal.App.4th 220, 237, fn. 7 [44 Cal.Rptr.2d 822]; Cal. Rules of Court, rule 14(a)(1)(B).)

Accordingly, although we reject SBC's commerce clause argument, and reverse summary judgment in its favor, we express no opinion on potentially relevant issues not yet litigated, including a rigorous *Pike* analysis.

A *Triable Issue Exists as to Whether SBC's HVP Policy Is a Tying Arrangement*

We now turn to the merits of RLH's claims against SBC. As noted *ante*, SBC does not contend Ameritech's HVP policy is not a tying arrangement, and for good reason: triable issues abound as to whether a tying arrangement exists. RLH's evidence tended to show SBC, at least through its Ameritech subsidiary, requires customers to lease SBC's HVP services as a condition of providing local telephone service. Unlike PacBell, Ameritech forbids its customers from buying and installing their own HVP devices, whether from RLH or anyone else. This policy may constitute a tying arrangement. (*Northern Pacific*, *supra*, 356 U.S. at p. 7 [railroad illegally used its market power in real estate to force lessees to send all shipping through railroad]; *International Salt Co. v. United States* (1947) 332 U.S. 392, 395–398 [92 L.Ed. 20, 68 S.Ct. 12] [defendant illegally tied salt sales to leases of its patented salt-dispensing machines].)

The court erred in relying on the lack of any anticompetitive agreement between SBC and other HVP device makers. The law forbids not just tying agreements between different parties; it forbids any tying "arrangement or condition." (*Morrison*, *supra*, 66 Cal.App.4th at p. 541.) It is sufficient that SBC linked its local telephone service to its own HVP service, regardless of whether SBC had any anticompetitive agreement with, or financial interest in, the makers of the HVP devices it used to provide that HVP service. (See *Carl Sandburg*, *supra*, 758 F.2d at p. 208 ["In the usual tying arrangement, it is not difficult to establish the economic interest element because the seller of the tying product is also the seller of the tied product"].)

Triable issues also exist as to the other three elements of an illegal tying arrangement. On appeal, SBC does not dispute Ameritech and its other subsidiaries have market power in the tying product, local telephone service; its subsidiaries' HVP policies affect a substantial amount of sales in the HVP market, and RLH suffered pecuniary losses therefrom. It thus waived these issues. (*Shamsian v. Atlantic Richfield Co.* (2003) 107 Cal.App.4th 967, 973, fn. 3 [132 Cal.Rptr.2d 635].) At any rate, the evidence tended to show Ameritech's share in the local telephone market ranges from 74 percent to 87 percent in the five states comprising the Mid west region. At least one Ameritech customer, Cinergy Corporation, would prefer to use RLH devices in its new facilities, but instead leases Ameritech's HVP services due to its HVP policy. This evidence, while not overwhelming, raises triable issues sufficient to survive summary judgment.

## DISPOSITION

The judgment in favor of PacBell is affirmed. It shall recover its costs on appeal. The judgment in favor of SBC is reversed. No costs are awarded to SBC or RLH in this interim proceeding, but may be assessed in the discretion of the superior court on behalf of the party ultimately prevailing below.

Rylaarsdam, Acting P. J., and O'Leary, J., concurred.

Respondents' petition for review by the Supreme Court was denied February 22, 2006, S139602.