**LIFE PARTNERS, INC., Plaintiff,**

v.

**Clinton MILLER, et. al., Defendants,**

and

**Robert McDonnell, in his official capacity as Attorney General of the Commonwealth of Virginia, Intervenor.**

**No. CIV.A. 305CV368–HEH.**

United States District Court,
E.D. Virginia,
Richmond Division.

March 10, 2006.

---

---

### *MEMORANDUM OPINION*

HUDSON, District Judge.

**(Denying Plaintiff's Motion for Summary Judgment and Granting the Motions for Summary Judgment Filed by the Defendants and the Intervenor)**

In this suit for declaratory judgment, Plaintiff challenges the constitutionality of

the Virginia Viatical Settlements Act as violative of the dormant Commerce Clause of the United States Constitution. The matter is before the Court on individual motions for summary judgment filed by each of the parties, along with memoranda in support and in opposition of the respective motions. The Court heard oral argument on February 27, 2006.

The Virginia Viatical Settlements Act ("the Act"), codified as Section 38.2–6000, Code of Virginia, 1950 as amended, regulates the sale of life insurance policies by terminally-ill persons to third parties for less than the full amount of death benefits provided under the policy. The Act defines terminally ill as "having an illness or sickness that can reasonably be expected to result in death in 24 months or less." The Act establishes elaborate regulatory measures governing viatical settlement agreements. The accompanying regulations set forth a specific minimum pricing schedule for such agreements. The focus of Plaintiff's challenge is the jurisdictional provisions of the regulatory scheme, including oversight by the Virginia Bureau of Insurance triggered solely by the legal residence of the viator. Plaintiff contends that the scope of Virginia's regulatory control is sufficiently broad to effect commerce occurring wholly outside the geographic boundaries of the Commonwealth of Virginia. Plaintiff further maintains that the price controls and regulatory scheme are inspired by economic protectionism and has the effect of discriminating against and discouraging interstate commerce.

Because aspects of this Court's dormant Commerce Clause analysis turn on the intrastate elements of the transaction giving rise to this controversy, a thorough recital of the underlying facts is critical. There appears to be no material facts in dispute.

The Court's findings of fact are mined from the statements of undisputed facts contained in each party's Memorandum in Support of Motion for Summary Judgment. A close examination of those statements reveal the following factual premise. The opinions of defense experts are considered separately.

## I. Background

The viator, Jane Doe ("Ms.Doe"),[1] was a resident of Martinsville, Virginia, and a client of Life Partners, Incorporated ("LPI"). There is no dispute that Ms. Doe met the statutory definition of a terminally-ill patient under the Act. Ms. Doe had a life insurance policy with a value of $115,000 at death. For undisclosed reasons, Ms. Doe elected to sell her life insurance policy, presumably to generate cash.

In order to market her policy, Ms. Doe contacted Ideal Settlement, Inc. ("Ideal"), a New Jersey corporation, through the internet. On March 16, 2004, Ms. Doe entered into an agreement ("the Agreement") with Ideal to market her policy. Under the terms of the Agreement, Ideal was engaged to serve as a broker and obtain bids for the purchase of Ms. Doe's policy. It appears to be undisputed that Ms. Doe never left the Commonwealth of Virginia, so presumably, the Agreement was arranged and negotiated by telephone. In order to locate an interested buyer, Ideal contacted the plaintiff, LPI.

LPI is a Texas corporation with its sole office in Waco and is a licensed viatical settlement provider under Texas law. LPI describes itself as an agent that represents purchasers in viatical transactions, but is not a broker. LPI is neither licensed in Virginia nor does business in the state. LPI markets their services nationally. The evidence is unclear whether LPI

---

1. Jane Doe is a pseudonym used by the Court to protect the identify of the viator.

has purchased other insurance policies from Virginia residents.

At the invitation of Ideal, LPI assembled a consortium of twelve (12) interested persons located in seven (7) states, who were interested in purchasing Ms. Doe's policy as a group. None of the twelve (12) members of the investment group resided in the Commonwealth of Virginia. In negotiating the viatical settlement at issue in this case, LPI contacted Ms. Doe in Virginia at least twice by telephone. LPI submitted three (3) bids, or sales proposals, to Ms. Doe with progressively increasing sales prices. The Agreement was sent by LPI from Texas to Ms. Doe in Virginia by FedEx. By its terms, Ms. Doe sold her $115,000 life insurance policy to the investment group for $29,900. The Agreement specified that "this agreement was entered into in the State of Texas and its validity, construction, interpretation and legal effects should be governed by the laws and judicial decisions of that State .... " (See Agreement at Section 7.11.) The Agreement further provided "that the transaction is governed by and subject to the rules and regulations governing viatical settlements under the Texas Insurance Code". (See Agreement at Section 7.12.) Ms. Doe executed the Agreement in Virginia and returned it to LPI in Texas, where it was countersigned by a corporate officer of LPI.

Subsequent to executing the Agreement, Ms. Doe contacted LPI and demanded payment of the minimum price prescribed by Virginia law for her insurance policy, which would have been $69,000 under the Virginia regulations. LPI declined, citing the provisions of the Agreement designating Texas law as controlling. Ms. Doe then filed a complaint with the Virginia Bureau of Insurance ("VBI"). After conducting a inquiry, the VBI concluded that LPI may need to obtain a Virginia license before transacting business in viatical settlements with a resident of the Commonwealth of Virginia. At the request of the VBI, the Virginia State Corporation Commission ("SCC") issued a rule to show cause against LPI requiring it to explain why it was conducting business without proper registration in violation of Section 38.2–6,000, *et seq*. This lawsuit followed.

## II. Standard of Review

Under Rule 56(c) of the Federal Rules of Civil Procedure, the Court must grant summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that it is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). After the movant has met this burden, the nonmoving party must come forward with specific facts showing that evidence exists to support its claims and that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of **material** fact. *See Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. "Rule 56(e) requires the non-moving party to go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. Summary judgment is proper if after viewing all the evidence, including supplemental affidavits, in the light most favorable to the non-moving party, the Court finds no genuine issue exists. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505.

## III. Standing

Before addressing the merits of the underlying action, the Court must first determine if the plaintiff has standing to contest the Act. Plaintiff has stated equivocally that its claim is limited to an as applied rather than a facial challenge.

 Article III of the United States Constitution requires a plaintiff to demonstrate their standing by showing that they have suffered a judicially cognizable and redressible injury. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 559–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). In order to demonstrate a cognizable injury, the plaintiff must show that: (1) they have personally suffered an actual or threatened injury that is concrete and particularized, not conjectural or hypothetical; (2) the injury fairly can be traced to the challenged action; (3) the injury is likely to be redressed by a favorable decision from the Court. *Burke v. City of Charleston,* 139 F.3d 401, 405 (4th Cir.1998) (citing *Lujan,* 504 U.S. at 560–61, 112 S.Ct. 2130).

 Assuming Plaintiff satisfies these constitutional requirements, they must also meet the requirements of prudential standing. *Id.* "Prudential considerations constitute a supplemental aspect of basic standing analysis and address concerns regarding the need for judicial restraint." *Oxford Assocs. v. Waste Sys. Auth.,* 271 F.3d 140, 145 (3rd Cir.2001). "Prudential standing entails an inquiry into a plaintiff's role because 'the aim of this form of judicial self-governance is to determine whether the plaintiff is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers." ' *Id.* To satisfy prudential requirements, plaintiff's must assert their own legal rights and interests rather than those of a third party. Plaintiffs must also show that their interests fall arguably within the zone of interests that the statute, rule or constitutional provision in question protects. Finally, the court should refrain from adjudicating a " 'generalized grievance shared in substantially equal measure by all or a large class of citizens ....' " *Burke,* 139 F.3d at 405 (quoting *Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)).

 Assuming without deciding that the Act discriminates against interstate commerce, Plaintiff clearly has shown a concrete and redressible injury. Plaintiff's injury stems from the SCC's issuance of the rule to show cause. This puts Plaintiff in the dilemma of either complying with an arguably unconstitutional statute or facing administrative sanction. A favorable ruling by this Court, invalidating the underlying statute, would clearly redress Plaintiff's injury and presumably terminate the show cause proceedings. As a result, this Court is convinced that the plaintiff has constitutional standing to challenge the Act.

 Plaintiff has also fulfilled the requirements of prudential standing. Enforcement of the Act would require the plaintiff to comply with all of its provisions. Therefore, Plaintiff's claim is not a generalized grievance, rather LPI has asserted its own individualized legal interest in assuring that it is not required to comply with an unconstitutional statutory provision. Furthermore, the plaintiff has alleged that the Act infringes on its right to engage in interstate commerce, and as a result, the claim falls squarely within the zone of interest the dormant Commerce Clause was designed to protect. As the United States Supreme Court has explained, Commerce Clause jurisprudence is designed to protect the states and "to benefit those who ... are engaged in interstate commerce." *Dennis v. Higgins,* 498 U.S. 439, 450, 111 S.Ct. 865, 112

L.Ed.2d 969 (1991). As a viatical provider, Plaintiff is engaged in interstate commerce and falls into the zone of interest protected by the dormant Commerce Clause. Accordingly, Plaintiff has demonstrated both constitutional and prudential standing to bring the present action.

## IV. Analysis

### A. The Commerce Clause

The Commerce Clause of the United States Constitution provides "Congress shall have Power ... [to] regulate Commerce ... among the several states." U.S. Const. Art. I., § 8, cl. 3. Congress's authority to regulate commerce pursuant to the Constitution inherently carries with it a prohibition to the states to refrain from enacting laws which impede the flow of interstate commerce. *See Cooley v. The Board of Wardens,* 53 U.S. 299, 318, 12 How. 299, 13 L.Ed. 996 (1851). This authority, known as the dormant Commerce Clause, "has long been understood ... to provide 'protection from state legislation inimical to the national commerce [even] where Congress has not acted.'" *Barclays Bank, PLC v. Franchise Tax Bd. of Cal.,* 512 U.S. 298, 310, 114 S.Ct. 2268, 129 L.Ed.2d 244 (1994) (quoting *Southern Pacific Co. v. Arizona ex rel. Sullivan,* 325 U.S. 761, 769, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945)). The dormant Commerce Clause "limits the power of the States to erect barriers against interstate trade." *Dennis,* 498 U.S. at 446, 111 S.Ct. 865. However, this limitation on state power "is by no means absolute. In the absence of conflicting federal legislation, the States retain authority under their general police powers to regulate matters of 'legitimate local concern,' even though interstate commerce may be affected." *Star Scientific, Inc. v. Beales,* 278 F.3d 339, 355 (4th Cir. 2002) (quoting *Lewis v. BT Inv. Mgrs.,*

*Inc.* 447 U.S. 27, 36, 100 S.Ct. 2009, 64 L.Ed.2d 702 (1980)).

Review of a dormant Commerce Clause challenge to a state statute requires a two-tier analysis. *Brown–Forman Distillers, Corp. v. New York Liquor Auth.,* 476 U.S. 573, 578–79, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986). The first tier of analysis, referred to as the discrimination tier, is a "virtually *per se* rule of invalidity" and applies "when a state statute clearly discriminates against interstate commerce." *Wyoming v. Oklahoma,* 502 U.S. 437, 454, 112 S.Ct. 789, 117 L.Ed.2d 1 (1992). When a statute is clearly discriminatory, the Court will apply strict scrutiny and the statute will be struck down unless the state demonstrates "that the discriminatory law is demonstrably justified by a valid factor unrelated to economic protectionism, and that there are no nondiscriminatory alternatives adequate to preserve the local interests at stake ...." *Envtl. Tech. Council v. Sierra Club,* 98 F.3d 774, 785 (4th Cir.1996) (internal citations omitted.) If the state statute does not "clearly discriminate" but instead "regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental ...." a less strict scrutiny applies, known as the undue burden tier or the *Pike* balancing tier. *Yamaha Motor Corp. v. Jim's Motorcycle Inc.,* 401 F.3d 560, 567 (4th Cir.2005) (quoting *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970) (internal quotation marks omitted)). Under a *Pike* analysis, a nondiscriminatory statute with only an incidental effect on commerce "will be upheld unless the burden imposed on ... commerce is clearly excessive in relation to the putative local benefits." *Id.* The Supreme Court has acknowledged that "there is no clear line separating close cases on which scrutiny [or which tier of analysis] should apply."

*Wyoming,* 502 U.S. at 455 n. 12, 112 S.Ct. 789.

## B. Discrimination Tier

 Under the discrimination tier, a statute clearly discriminates when it "discriminates facially, in its practical effect, or in its purpose." *Envtl. Tech. Council,* 98 F.3d at 785 (4th Cir.1996). A statute discriminates in its practical effect when it favors in-state economic interests over out-of-state economic interests, or when it has an extraterritorial reach such that it regulates commerce wholly outside the state's borders. *See Brown–Forman,* 476 U.S. at 579, 106 S.Ct. 2080, *See also Healy v. Beer Inst.* 491 U.S. 324, 336, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989); *Baldwin v. G.A.F., Seelig, Inc.,* 294 U.S. 511, 521, 55 S.Ct. 497, 79 L.Ed. 1032 (1935).

Plaintiff mounts its constitutional attack on all fronts. LPI argues that the regulatory scheme is per se unconstitutional because it directly affects interstate commerce. Specifically, LPI maintains that the Act regulates transactions predominately interstate in nature, transactions occurring outside the Commonwealth of Virginia, influences out-of-state pricing behavior, and subjects market participants to inconsistent regulations. Alternatively, LPI asserts that the Act is unconstitutional under a second or *Pike* tier analysis, in that it imposes undue burdens on interstate commerce, which are not outweighed by its putative local benefits.

Defendants counter that the Act does not violate the dormant Commerce Clause because it regulates evenhandedly with only incidental effects which do not excessively burden interstate commerce. In the alternative, Defendants offer two (2) independent grounds on which this Court could find the Act to be a constitutionally appropriate exercise of power, without reaching the core issue, namely that: (1) Congress

has expressly approved state regulation of the viatical settlement industry; and (2) the Act is immunized from a dormant Commerce Clause attack by the McCarran–Ferguson Act ("McCarran–Ferguson"). *See* 15 U.S.C. § 1011 *et. seq.* The Court will address these arguments before reaching its dormant Commerce Clause analysis.

 "Where state or local government action is specifically authorized by Congress, it is not subject to the Commerce Clause even if it interferes with interstate commerce." *White v. Massachusetts Council of Constr. Employers, Inc.,* 460 U.S. 204, 213, 103 S.Ct. 1042, 75 L.Ed.2d 1 (1983). However, in order to exempt a state statute from the implied implications of the Commerce Clause, Congress's intention to do so must be " 'unmistakably clear' or 'expressly stated.' " *Envtl. Tech. Council,* 98 F.3d at 782 (4th Cir.1996) (quoting *South–Central Timber Dev., Inc. v. Wunnicke,* 467 U.S. 82, 91–92, 104 S.Ct. 2237, 81 L.Ed.2d 71 (1984)).

 Defendants argue that Congress specifically authorized states to regulate viatical settlements by enacting Title 26 U.S.C. § 101(g)(2)(B) of the United States Tax Code. This statute provides tax exempt status to proceeds of the sale of an insurance contract sold to a viatical settlement provider if the provider is licensed in the state in which the insured resides, or complies with certain provisions of the Model Regulations or the Model Act. *See* 26 U.S.C. § 101(g)(2)(B).

On careful review, the Court is of the opinion that the statute neither provides express congressional authority to regulate interstate viatical transactions, nor is "unmistakably clear" as to Congress's intent to authorize states to do so. In fact, there is no evidence in the legislative history that Congress ever intended § 101(g) to

grant such authority to the states. Rather, the statute only evidences a legislative desire to extend tax benefits to viators. Accordingly, this Court declines to adopt Defendants' overly broad interpretation of the effect of this statute. The Court, however, will not entirely discount the significance of § 101(g). As will be explored in greater detail below, this statute conveys undeniable benefits to viators and plays a role in the Court's dormant Commerce Clause analysis.

With respect to Defendants' argument concerning the applicability of McCarran–Ferguson, it is unnecessary for the Court to reach the merits of this argument given its ultimate finding that the Act does not violate the dormant Commerce Clause.

■ Turning back to the merits of LPI's Commerce Clause challenge, central to the elements of Plaintiff's direct regulation argument is the contention that the viatical settlement agreement in this case was a Texas transaction, placing it beyond the reach of Virginia regulatory laws. Plaintiff's position flows from the language of the Agreement, namely Sections 7.11 and 7.12, and the fact that significant portions of the underlying course of dealings occurred from Plaintiff's Texas headquarters. As further evidence of tenuous Virginia ties, Plaintiff notes that Ms. Doe initially placed her policy with Ideal, a New Jersey based company, through the internet.

The two provisions of the Agreement relied upon by Plaintiff read in pertinent part:

Section 7.11: This Agreement was entered into in the State of Texas and its validity, construction, interpretation and legal effect shall be governed by the laws and judicial decisions of that state. . . .

Section 7.12: This Agreement is governed by and subject to the rules and regulations relating to viatical settlements as that term is defined under the Texas Insurance Code and regulations promulgated thereunder. The Parties hereby agree that the Texas Department of Insurance has regulatory jurisdiction over this transaction irrespective of the residence of the Seller . . . .

Section 7.11 appears to be a standard choice of law provision. If the terms of the Agreement were in dispute, or their legal effect uncertain, a reviewing court would look to the law of the State of Texas to resolve the controversy. Furthermore, the parties agreed in Section 7.12 that the Texas Department of Insurance would have regulatory jurisdiction over the transaction irrespective of the residence of the seller. However, this stipulation did not totally divest the Commonwealth of Virginia of regulatory jurisdiction over transactions occurring with its residents within its borders. If the transaction between Ms. Doe and LPI had occurred "wholly outside" the boundaries of the Commonwealth of Virginia, the regulatory scheme at issue may be unconstitutional. *Edgar v. MITE Corp.*, 457 U.S. 624, 642, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982). If on the other hand the transaction occurred within the boundaries of the Commonwealth of Virginia, it would be constitutional so long as the regulation furthered legitimate in-state interest. *Id.* at 643–46, 102 S.Ct. 2629. In the immediate case, the agreement formed between LPI and Ms. Doe implicated the regulatory interest of both Texas and Virginia. "Thus, when an offer is made in one state and accepted in another, we now recognize that elements of the transaction have occurred in each state, and that both states have an interest in regulating the terms and performance of the contract." *A.S. Goldmen & Co. v. New Jersey Bureau of SEC*, 163 F.3d 780, 787 (3rd Cir.1999).

Plaintiff relies on *Dean Foods Co. v. Brancel*, 187 F.3d 609 (7th Cir.1999), for its contention that the Agreement in this case was the product of a transaction occurring wholly outside the Commonwealth of Virginia. *Dean Foods* involved a constitutional challenge to Wisconsin's milk pricing regulations. Wisconsin farmers conducted what the court described as preliminary negotiations for the sale of milk with Illinois dairy plants. This included telephone contact and meetings with field representatives. However, the transaction was not complete until Wisconsin farmers transported their product to Illinois plants. The contract was not final until the product had been examined and accepted. The court in *Dean Foods* held that the contract was formed in Illinois and that Wisconsin could not regulate the price of milk sold in Illinois.

The court in *Dean Foods* distinguished the case from *A.S. Goldmen & Co.*:

> There, an offer was made by a securities dealer in New Jersey and accepted by various individuals outside of New Jersey. . . . That stands in marked contrast to the situation here, where we have held that the contract was created and performed wholly in Illinois. This is not a case where 'elements of the transaction have occurred in each state.'

187 F.3d at 620.

LPI also draws the Court's attention to *Shafer v. Farmers' Grain Co. of Embden*, 268 U.S. 189, 45 S.Ct. 481, 69 L.Ed. 909 (1925). At issue in *Shafer* was the interstate effect of the North Dakota Grain Grading Act. The act established an elaborate system for grading and regulating wheat earmarked for interstate shipment. The purpose or intent of the act was to prevent unreasonable margins of profit. 268 U.S. at 200, 45 S.Ct. 481. The Supreme Court struck down the act as violative of the dormant Commerce Clause because it directly affected the price of wheat sold in other states. *Shafer* is distinguishable from the immediate case because here the sale of Ms. Doe's life insurance policy occurred, at least in part, in Virginia. In addition, unlike *Shafer*, the Virginia Act, and accompanying regulation, prescribes identical regulation and pricing for in-state and out-of-state transactions.

A survey of dormant Commerce Clause jurisprudence reveals no widely accepted standard to assess the sufficiency of a state's contacts and interests to justify regulatory measures. Perhaps the most instructive case on this point, decided by the United States Court of Appeals for the Fourth Circuit, is *Underhill Assoc., Inc. v. Bradshaw*, 674 F.2d 293 (4th Cir.1982). In *Underhill*, a group of discount securities brokers challenged the power of the Commonwealth of Virginia to regulate the activities of non-resident securities brokers under both the Commerce Clause and the Due Process Clause of the Fourteenth Amendment. In upholding the regulatory scheme, the Fourth Circuit noted "[t]o determine Virginia's power to regulate the activities of nonresidents, we must look to the extent of these nonresidents' contacts with Virginia and to the nature and extent of the state's interest in exercising its authority." *Id.* at 295. The court cited approximately a dozen decisions of the U.S. Supreme Court or other circuits consistent with this conclusion, including *Travelers Health Ass'n v. Virginia*, 339 U.S. 643, 648, 70 S.Ct. 927, 929, 94 L.Ed. 1154 (1950), and *Merrick v. N.W. Halsey & Co.*, 242 U.S. 568, 37 S.Ct. 227, 61 L.Ed. 498 (1917). The court went on to conclude in *Underhill* that "[i]t is not only desirable, but Virginia's interest in protecting its citizens from possibly dishonest or incompetent securities dealers is obvious." *Underhill*, 674 F.2d at 295.

Applying the contacts and interest approach announced in *Underhill* to the immediate case, it is this Court's opinion that the viatical settlement transaction at issue involved sufficient contacts with the Commonwealth of Virginia to warrant compliance with its regulatory scheme if the underlying statute is constitutionally sound. Not only did Ms. Doe reside in Virginia, but it is undisputed that she never left the Commonwealth during the negotiations leading up to this viatical settlement agreement. She placed and received calls in Virginia. She received multiple settlement agreements sent to Virginia for her review, two (2) of which she rejected. Most importantly, she signed the final Agreement in Virginia.

The choice of law provisions contained in the Agreement do not change this result. If this case were a dispute over the terms of the Agreement, Section 7.11 would clearly dictate that the law of Texas would control. Furthermore, if the Agreement had been consummated outside of the Commonwealth of Virginia, Section 7.12 would give the Texas Department of Insurance exclusive regulatory jurisdiction. However, since the transaction touched both Virginia and Texas, it implicated the legislative interests of both states. *See A.S. Goldmen & Co.,* 163 F.3d at 786–87.

The Court therefore concludes that the viatical settlement agreement in this case was not the product of a purely Texas based transaction as Plaintiff argues. The contacts with Virginia are sufficient to give the Commonwealth regulatory jurisdiction. If the factual basis on which this case is premised involved a viatical settlement agreement negotiated and consummated totally beyond the borders of Virginia, even by a Virginia resident, portions of the Act may well offend the dormant Commerce Clause. That, however, must be left for a later date.

The Court will turn next to the individual parts of Plaintiff's first tier or per se invalidity argument. This facet of Plaintiff's challenge has four (4) components, namely that the Act: 1) regulates transactions predominately interstate in nature; 2) regulates transactions occurring outside the Commonwealth of Virginia; 3) influences out-of-state pricing behavior; and 4) subjects market participants to inconsistent regulation.

For the reasons discussed above, this Court rejects the contention that under the facts of this case, the Act regulates only interstate commerce and is extraterritorially regulating "a Texas contract." Significant parts of this transaction occurred in Virginia, which justified regulatory oversight. The fact that there are no viatical settlement providers with offices in Virginia is inconsequential. Twelve (12) viatical settlement providers are licensed in Virginia. If a provider chooses to enter the Virginia viatical settlement market and do business with a terminally-ill viator physically located in Virginia, it does not overly burden interstate commerce to require compliance with the Commonwealth's regulatory scheme. Moreover, the Act affects providers situated both within and without the Commonwealth equally.

Relying on the opinions of its experts, LPI contends that Virginia's pricing regulations for viatical agreements unduly influence the marketing of similar agreements in other states. In its experts' view, the higher prices required by the regulations accompanying the Act, skew prices elsewhere and directly affect the interstate market. The experts opine that Virginia's price controls are a barrier to the marketability of policies offered for sale by Virginia residents. Their position is based in part on the fact cited by LPI that over a designated period, 170 policies were sold

by Virginia viators, and only three (3) were sold in conformity with the price regulations at issue. LPI argues that it is a reasonable inference that the price controls were evaded, because otherwise, the policies would have been unmarketable. Essentially, Plaintiff contends that the Virginia minimum price controls set a price that is so artificially high that no reasonable viatical settlement company would ever agree to enter into a sale or purchase at those prices. Assuming that LPI's experts are correct, this incidental effect does not necessarily transgress the dormant Commerce Clause.

Contrary to Plaintiff's argument, the Virginia pricing schedule does not discriminate against out-of-state transactions. The pricing regulations affect all markets equally, irrespective of whether the policy is sold in Virginia, Texas or California. By electing to transact business with a client physically located in Virginia, Plaintiff chose to enter a regulated market, fully cognizant of the price restrictions. This is not the case of a product being exported to another state for sale in that jurisdiction. The incidental effect of the intrastate pricing of viatical settlements on the interstate market is no different than the price of any other commodity sold in the Commonwealth, regulated or unregulated.

The opinion advanced by LPI's experts that Virginia pricing regulations are a direct barrier to interstate marketability adds little to Plaintiff's argument. If the pricing schedule chills the interstate market, it has an identical effect on intrastate sales.

 The last segment of Plaintiff's first tier challenge involves the alleged effect of inconsistent regulations on inter-

state commerce. According to Plaintiff, the Act creates irreconcilable conflicts when dealing with providers from other states. Plaintiff argues that the Act violates the dormant Commerce Clause because it subjects out-of-state businesses to inconsistent regulatory regimes. "A state regulation might impose a disproportionate burden on interstate commerce if the regulation is in substantial conflict with a common regulatory scheme in place in other states." *Nat'l Elec. Mfrs. Ass'n v. Sorrell,* 272 F.3d 104, 112 (2nd Cir.2001) (citing *Raymond Motor Transp. v. Rice,* 434 U.S. 429, 445, 98 S.Ct. 787, 54 L.Ed.2d 664 (1978)). However, "state laws which merely creates additional, but not irreconcilable, obligations are not considered to be 'inconsistent' for this purpose." *Instructional Sys., Inc. v. Computer Curriculum Corp.,* 35 F.3d 813, 826 (3rd Cir.1994).

Specifically, Plaintiff identifies two (2) conflicts between Virginia and Texas regulations.[2] First, Plaintiff argues that § 38.2–6012(C) of the Act conflicts with Title 28 Texas Administrative Code § 3.1710(c)(8) (2006) because "the Act regulates which state's laws govern contractual disputes between competing viators, irrespective of the contractual agreements executed by the parties." (Pl. Mot. Summ. J. at 17.) Plaintiff asserts that this provision is in direct conflict with Texas law which states "no viatical or life settlement provider ... shall enter into any viatical or life settlement in which any form used to effect the settlement ... makes any other state's laws as the law applicable to the form." *Id.* (quoting 28 Tex. Admin. Code § 3.1710(c)(8) (2006)).

The Court is of the opinion that Plaintiff misconstrues § 31710(c)(8) in an attempt

---

**2.** This Court has reviewed Plaintiff's Exhibit 9 in support of its conflicting regulation argument. However, Plaintiff highlights no specific inconsistencies other than the two (2) mentioned above, and the Court will not conduct a line by line analysis on its own.

to create a conflict where one does not exist. Section 31710(c)(8) states in full:

> [n]o viatical or life settlement provider, provider representative, or broker shall:

> enter into any viatical or life settlement **in this state** in which any form used to effect the settlement, including escrow or trust agreement, contains a provision that either requires or limits a viator, life settlor, or owner to resolve a legal dispute with the viatical or life settlement provider, provider representative, or broker in any state other than Texas, specifics a particular city or county, or resolving dispute, or makes any other state's laws as the law applicable to the form (emphasis added).

It is clear from the plain language of the statute that § 31710(c)(8) prohibits a viatical provider or broker from entering into a viatical agreement which contains a choice of law provision, which gives another state regulatory authority over the transaction if the agreement **is entered into in Texas**. As mentioned above, the Agreement in question was not "entered into in Texas" and as a result, there is no actual tension between the laws of Virginia and Texas. As the Second Circuit has advised, "[i]t is not enough to point to a risk of conflicting regulatory regimes in multiple states; there must be an actual conflict between the challenged regulation and those in place in other states." *Nat'l Elec. Mfrs. Ass'n*, 272 F.3d at 112. Accordingly, this Court declines to invalidate a state law based on a hypothetical conflict or mere speculation that there may be a potential conflict under a different factual setting.

Plaintiff next contends that there is an irreconcilable conflict between the law of the two (2) states because the Virginia Act presumes that a viatical settlement broker is the agent of the viatical settlement provider, unless there is a written agreement between the broker and the viator specifying otherwise. 14 Va. Admin.Code. § 5–71–50 (2005). This, LPI claims, is in direct conflict with Texas law which requires a broker to act as a fiduciary to the viator and forbids a broker from being the agent of the provider. 28 Tex. Admin. Code § 3.1711 (2006). Essentially, Plaintiff argues that it is impossible for a viatical settlement broker to comply with both regulations because Texas law requires the broker to be the fiduciary of the viatical settlement provider, while Virginia law requires a broker to be the fiduciary of the viator. The Court is not convinced that this facial inconsistency rises to the level of an irreconcilable conflict. Virginia law does not forbid a broker from acting as an agent for the viator. Rather, it merely requires that the broker first obtain written authorization from the provider before doing so. As a result, a broker can comply with the laws of both states by simply executing a written agreement authorizing it to act as an agent of the viator. The fact that Virginia law has additional requirements does not make it irreconcilable with Texas law. It is merely the cost of doing business, which the Plaintiff assumed when they chose to conduct business in a state other than Texas.

In the final analysis, the Court finds the Virginia Viatical Settlements Act neither discriminates against interstate commerce facially nor in its practical effect. It treats those in-state and out-of-state providers wishing to do business in the Virginia market similarly. Furthermore, there is no tenable basis for Plaintiff's claim that the law was enacted for a discriminatory purpose. It was clearly not intended to protect the economic interests of Virginia-based settlement providers. There are none. Its obvious purpose was to safeguard an asset of some of its most vulnerable citizens, the terminally ill.

The Commonwealth of Virginia has a legitimate interest in protecting the welfare of terminally-ill citizens seeking to liquidate their life insurance policy within its borders. Given the fact that thirty-seven (37) other states have adopted similar versions of the Model Viatical Settlements Act, on which the Virginia statute is based, it appears to be an appropriate exercise of its police powers.

### C. Undue Burden Tier

■ Having determined that the Act does not clearly discriminate facially or in its direct practical effect, the Court must now determine if it violates the second tier of the analysis. This facet of the analysis is governed by balancing the factors articulated in *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970). *Pike* applies when a state law does not consciously discriminate against interstate commerce, but instead regulates evenhandedly and only indirectly affects interstate commerce. *Brown–Forman*, 476 U.S. at 579, 106 S.Ct. 2080. "Where [a] statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on commerce is clearly excessive in relation to the putative local benefits." *Pike*, 397 U.S. at 142, 90 S.Ct. 844. In applying the *Pike* balancing test, the Court should balance "(1) the nature of the local benefits advanced by the statute; (2) the burden placed on interstate commerce; and (3) whether the burden is 'clearly excessive' when weighed against these local benefits." *Star Scientific*, 278 F.3d at 357.

■ The first task is to determine if the Act has a legitimate local purpose. If the Court finds a legitimate local purpose, "then the question becomes one of degree ... [a]nd the extent of the burden that will be tolerated will ... depend on the nature of the local interest, and on whether it could be promoted as well with a lesser impact on interstate activity." *Id.* at 356–57. "In determining whether a statute has a 'legitimate local purpose' and 'putative local benefits,' a court must proceed with deference to the state legislature." *Yamaha Motor Corp.*, 401 F.3d at 569.

■ The Court finds that the Act has a legitimate and important local purpose, namely, the protection of Virginia viators. It is obvious to the Court that a terminally-ill person with a life expectancy of twenty-four (24) months or less is in a particularly vulnerable position and could easily fall prey to sharp business practices and fraud. The Act's various requirements provides the SCC with a regulatory framework which affords Virginia viators with some assurance that the viatical settlement industry will transact business in an honest and ethical fashion. These regulatory burdens impose requirements similar to those governing such other industries as banking, insurance and security dealers. The Act also provides viators with a recourse should the brokers or providers fail to comply with these standards. Finally, when read in tandem with 26 U.S.C. § 101(g)(2)(B) of the Tax code, the Act bestows considerable tax benefits on viators by exempting the proceeds from the sale of their insurance polices from federal income tax.

■ Plaintiff offers a host of perceived burdens to be weighed against the local benefits of the Act. Plaintiff disputes the defendants' contention that the statute actually protects Virginia viators. Aside from Ms. Doe's complaint, there is no evidence of any other reported cases of alleged fraud or abuse in the Virginia viator settlement industry. Therefore, Plaintiff argues that there is no demonstrated harm which warrants the protection of the Act.

Plaintiff's argument, however, fails to acknowledge the possibility that the Act has been successful in its purported purpose and has deterred unethical or fraudulent activity within the industry. Plaintiff's position also marginalizes the rationale underlying the Model Viatical Settlements Act which has been adopted, at least in part, by over thirty (30) states. Obviously, the legislative bodies of those states uniformly found a sufficient potential for abuse to warrant protective measures. Ostensibly, the Virginia General Assembly made similar findings. This Court is not "inclined to second guess the impartial judgments of lawmakers concerning the utility of legislation." *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 92, 107 S.Ct. 1637, 95 L.Ed.2d 67 (1987). At bottom, this Court must limit its consideration of "whether the legislature had a rational basis for believing there was a legitimate purpose that would be advanced by the statute . . . [and] likewise apply a deferential standard in identifying a statute's putative benefits." *Yamaha Motor Corp.*, 401 F.3d at 569 (citing *CTS Corp.*, 481 U.S. at 92–93, 107 S.Ct. 1637).

Relying largely on the opinions of its experts, Plaintiff next counters that the Act, when carefully examined, provides minimal benefits to Virginia viators. Plaintiff contends that the pricing regulations actually disserve Virginia viators by impeding the marketability of their policies. Because the regulation-driven price of Virginia policies exceeds the mean national market price, Virginia policies are not competitive. This "argument [however] relates to the wisdom of the statute, not its burden on commerce." *Exxon Corp. v. Governor of Maryland*, 437 U.S.

117, 128, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978). If Virginia viators find the price controls to be a barrier to marketing their policies, they should petition the Virginia General Assembly or the SCC for relief.[3] Finally, it is important to keep in mind that the Virginia pricing policy effects intrastate and interstate sales equally.

Plaintiff further maintains that Ms. Doe derived no significant protection from the Virginia regulatory scheme because the laws of Texas afforded her similar coverage. This may be true in the abstract, but the obvious flaw in Plaintiff's position is the necessity for Ms. Doe, a terminally-ill person, to travel to the State of Texas to avail herself of a Texas forum. Plaintiff further suggests that Virginia's anti-fraud laws provide viators with ample protection from unprincipled practices. The Virginia Viatical Settlements Act is intended to encompass many types of unethical and unfair trade practices which may not amount to fraud. Rather than require an injured viator to cobble together a cause of action from an assortment of legal theories, the Virginia General Assembly chose to address it directly. The benefits of this approach are self-evident.

The last category of burdens which allegedly outweigh the local benefits is the elaborate regulatory scheme required of viatical settlement brokers and providers in Virginia. According to Plaintiff's experts, Virginia's redundant licensing and regulatory requirements, particularly when coupled with price controls, affect both intrastate and interstate viatical transactions, with the primary effect of a disproportionate burden on smaller firms.

---

**3.** The Court also questions the legitimacy of Plaintiff's argument based on the fact that statistics, produced by the Bureau of Insurance, indicate that the number of viatical settlement transactions occurring in Virginia, by parties licensed in accordance with the Act, has steadily increased since 2001. These statistics indicate there is an increasing viatical market in Virginia, despite any incidental effects of the Act on the market.

■ The Court first notes that any disproportionate effect the Act has on smaller firms as opposed to larger firms, is irrelevant to dormant Commerce Clause analysis. The Court may not limit its focus to the affect of the Act on one particular type of entity. Rather, the Court must look to the affect of the Act on the entire viatical market. As the Supreme Court advised in *Exxon Corp.*, "the Clause protects the interstate market, not particular interstate firms, from prohibitive or burdensome regulations." 437 U.S. at 128, 98 S.Ct. 2207.

■ As to the effect of the Act on the intrastate market, Plaintiff's experts contend that the Act affects the intrastate market because "voluntary transactions that would otherwise have taken place are blocked, or must take place outside the state [of Virginia]." There is little doubt that the Act imposes some burden on both intrastate and interstate commerce. However, as mentioned above, the Act burdens both the in-state and out-of-state markets equally. This fact substantially undermines Plaintiff's argument. The Court finds that the incidental burden imposed by the Act on both markets is justified as a legitimate function of the state's police powers. It is clear that "in the absence of conflicting legislation by Congress, there is a residuum of power in the state to make laws governing matters of local concern which nevertheless in some measure affect interstate commerce or even, to some extent regulate it." *Hunt v. Washington State Apple Advertising Com'n*, 432 U.S. 333, 350, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977) (internal citations omitted). Furthermore, "[t]he State is entitled to exercise its police power in the manner it sees fit, so long as it is legislating constitutionally." *Baltimore Gas & Elec. Co. v. Heintz*, 760 F.2d 1408, 1425 (4th Cir.1985). There can be little doubt that protecting

viators from fraud is a local concern which falls within the residuum of the state's police powers. Assuming without deciding that some viators will voluntarily leave the state to do business in order to avoid the regulatory effects of the Act, this is not the type of burden that the dormant Commerce Clause was designed to protect against.

The Court is also of the opinion that the expert's analysis of the effect of the Act on the interstate market is of little value based on the facts before the Court. The experts contend that "if a state like Virginia is permitted to enforce its minimum price control regulation across the national market, the vast majority of Virginia sellers would be shut out of the market." (Pl.'s Ex. 6 ¶ 30.) However, contrary to the experts' conclusion, Ms. Doe's transaction is not a situation in which Virginia is enforcing the provisions of the Act "across the national market place." As discussed above, this is a transaction which occurred at least in part in the Commonwealth of Virginia. If Virginia was in fact enforcing the Act across the national market place, this alleged burden may be more significant to the Court's analysis. However, this is not the case and the Court will not invalidate a state statute based on facts which are not before it.

As a result, this Court finds that the Act effectuates a legitimate local public interest and that its effects on interstate commerce are only incidental. Therefore, the Act must "be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike*, 397 U.S. at 142, 90 S.Ct. 844. The Court further finds that the burdens imposed by the Act are not "clearly excessive" when compared with the legitimate and important purpose behind the Act. The Court is also of the opinion that nothing short of Virginia's comprehensive

regulatory scheme, which couples licensing and registration with price controls, could provide a level playing field for its physically infirm citizens financially constrained to liquidate their life insurance policy. The Virginia Viatical Settlements Act is far from a vagrant protectionist whim. It parallels legislation enacted in over thirty (30) other states with a common origin, the Model Viatical Settlements Act. Thus, the Court concludes that the legitimate purpose of the Act cannot be achieved with a lesser impact on interstate commerce.

## V. Conclusion

The Court finds that the Virginia Viatical Settlements Act does not violate the Commerce Clause of the United States Constitution and, therefore, Plaintiff's Motion for Summary Judgment will be denied. Defendants' and Intervenor's Motions for Summary Judgment will be granted.

An appropriate Order will accompany this Memorandum Opinion.

### ORDER

(Denying Plaintiff's Motion for Summary Judgment and Granting the Motions for Summary Judgment Filed by the Defendants and the Intervenor)

THIS MATTER is before the Court on cross-Motions for Summary Judgment. For the reasons stated in the accompanying Memorandum Opinion, Plaintiff's Motion for Summary Judgment is DENIED. Defendants' and Intervenor's Motions for Summary Judgment are GRANTED.

The Clerk is directed to send a copy of this Order to all counsel of record.

It is SO ORDERED.