The Honorable David Johnson State Representative 1704 North Harrison Street Little Rock, Arkansas 72207-5324
Dear Representative Johnson:
I am writing in response to your request for an opinion concerning the Arkansas Check Cashers Act of 1999, codified at A.C.A. § 23-52-101
to-117 (Repl. 2000 and Supp. 2007). You state the following facts and pose the following two questions:
 The particular situation in which I am interested involves a foreign corporation that opens a check cashing establishment in Arkansas that offers to consumers a deferred presentment option arrangement, otherwise known as a payday loan. The contract that the foreign corporation and each consumer execute in Arkansas includes a choice of law provision that provides that the contract is subject to the law of another state. For your reference, I have enclosed a sample copy of such a contract. The establishment, although owned by and doing business on behalf of the foreign corporation, otherwise operates as any Arkansas-owned check-casher and meets the definition of "check-casher" as codified at Arkansas Code § 23-52-102. The establishment or the foreign corporation may be licensed by the Arkansas State Board of Collection Agencies.
 Given the circumstances that I have described, I am curious about the enforceability of the Check Cashers Act of 1999 against the *Page 2 
foreign corporation to the extent that it is conducting business in Arkansas. I also am curious, provided that The Check Cashers Act of 1999 is enforceable against such interest, if the Arkansas State Board of Collection Agencies, by choosing nonetheless not to enforce the Check Cashers Act of 1999 against the interest, is exceeding its statutory authority.
 RESPONSE
I cannot answer your first question due to its fact intensive nature. Although you have provided a sample contract in this regard, I cannot determine the issue from a bare review of that contract without detailed evidence as to the nature, status and relationship of the foreign corporation and its in-state "establishment." There is, of course, a presumption that regulatory statutes like those contained in the Check-cashers Act do not apply extraterritorially. To the extent your first question relates to the possible extraterritorial application of the Check-cashers Act to the foreign corporation, in my opinion the operations of the foreign corporation would have to be reviewed to determine whether its contacts within the state are sufficient to justify the exercise of the Board's regulatory authority. This factor must be considered along with a review of the State's interests in regulating the subject matter. The inquiry can only be determined on a case-by-case basis. In my opinion the existence of a "choice of law" provision in a contract such as you describe may dictate the applicable law as between the parties to the contract, but does not necessarily control the question of whether the State may exercise its regulatory power over the corporation in question. As also explained below, in my opinion the provisions in the sample contract you have enclosed, stating that the contract is between the customer and the foreign corporation and not between the customer and the "servicer," and stating that the offer will either be approved or rejected by the foreign corporation at its out-of-state location, are also not necessarily dispositive of the question. In response to your second question, administrative officers and agencies are generally vested with discretion in the exercise of their powers and duties. Assuming the Board is not enforcing the Act against the foreign entity you describe, the applicable question is whether the Board is failing to exercise its authority to the fullest extent statutorily and constitutionally possible. Again, that underlying issue will depend upon the facts of a given case. In my opinion the Board is invested with a substantial measure of discretion in this regard. *Page 3 
 Question 1 — Given the circumstances that I have described, I amcurious about the enforceability of The Check Cashers Act of 1999against the foreign corporation to the extent that it is conductingbusiness in Arkansas.
The Arkansas "Check-cashers Act" is codified at § 23-52-101-117 (Repl. 2000 and Supp. 2007). Among other things, it prohibits persons from engaging in the check-cashing business without a permit, sets allowable check-cashing fees, requires disclosure of fees to customers, sets the parameters of the check-cashing business, sets certain minimum financial requirements for check-cashers, including the posting of a bond, and authorizes the State Board of Collection Agencies to promulgate reasonable regulations to enforce the subchapter. I assume that your reference to the "enforceability" of the Check-cashers Act involves a question as to whether the foreign corporation you describe can be required to obtain a permit, comply with the applicable financial responsibility requirements and be subjected to the regulatory authority of the State Board of Collection Agencies.
The relevant statutory scheme does not expressly address the applicability of the Act to foreign corporations, or indicate what actions might be required inside the state before the Board's regulatory jurisdiction attaches. The Act defines "check-casher" as "a person who for compensation engages, in whole or in part, in the check-cashing business. . . ." A.C.A. § 23-52-102(3) (Supp. 2007). The Act states at A.C.A. § 23-52-103 that "No person shall engage in the check-cashing business without first obtaining a permit. . . ." In addition, A.C.A. § 23-52-109(a) (Supp. 2007) provides that if the Board finds that the qualifications prescribed for a permit have been met, it " . . . shall issue to the applicant a permit to engage in the check-cashing businessin Arkansas at the locations specified in the application as approved by the board." (Emphasis added). Although this latter language describes the scope of the permit, once issued, the applicable subchapter does not indicate what actions of a foreign corporation or its agents in Arkansas will subject it to regulation by the Board. The applicable regulations are similarly silent in this regard. It has been stated that "[s]tate statutes often do not textually limit their application to the state of issuance, because it is axiomatic that a state statute typically applies to the state in which it has been passed as law"). SPGGC, Inc. v.Blumenthal, 408 F.Supp2d 87 (D.Conn. 2006), aff'd in part, vacated inpart, and remanded in SPGGC v. Blumenthal, ___ F.3d ___, 2007 WL 3036812
(2nd Cir. 2007). In answer to your first question regarding "enforceability" of the Act, therefore, the issue in each instance depends upon whether the foreign corporation *Page 4 
"engages, in whole or in part, in the check-cashing business" and/or whether application of the Check-cashers Act to a particular foreign corporation would be impermissibly "extraterritorial" as to the corporation.
The first inquiry depends upon factual considerations. As stated above, I cannot determine the issue because in the rendering of official Attorney General Opinions, I am not empowered as a fact-finder. Your question appears to assume, however, that the foreign corporation is engaged in the check-cashing business. With regard to the second inquiry, there is of course, as indicated above, a presumption against the extraterritorial effect of state statutes. See, e.g., Chalmers v.Toyota Motor Sales, 326 Ark. 895, 906-07, 935 S.W.2d 258 (1996) ("As a general rule, statutes have no effect except within the state's own territorial limits."). It has been stated that this "broad presumption guards against possible conflicts with other states' laws and violations of the Commerce Clause." Judkins v. Saint Joseph's College ofMaine, 483 F.Supp.2d 60 (D. Me. 2007). As explained in Sexton v. RyderTruck Rental, Inc., 413 Mich. 406, 320 N.W.2d 843 (1982):
 The general rule of law is that no state or nation can, by its laws, directly affect, bind, or operate upon property or persons beyond its territorial jurisdiction. This extraterritoriality rule has a long history in international and common law. However, as populations and technology progressed and travel between countries and among the states increased to an everyday occurrence, exceptions to the rule of extraterritoriality were created so that it is now recognized that a state may have the power to legislate concerning the rights and obligations of it citizens with regard to transactions occurring beyond its boundaries.
Id. at 855. See also In re Cousino, 364 B.R. 289 (N.D. Ohio 2006) (discussing the extraterritorial effect of a Michigan statute on interstate transactions relating to the contracting business, and stating that the U.S. Constitution "places limits — such as those arising under the Due Process Clause, the Full Faith and Credit Clause and the Commerce Clause — with regards to the extraterritorial application and reach of a state's statutes").
A number of different constitutional provisions may thus restrict a state's power to apply its laws to transactions occurring beyond its borders, most notably the *Page 5 
"dormant" commerce clause and the due process clause. With regard to the commerce clause, it is settled that a state statute that directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting state's authority. Healy v.The Beer Institute, 491 U.S. 324 (1989). See also Edgar v. MiteCorp., 457 U.S. 624 (1982) and Cotto Waxo Co. v. Williams, 46 F.3d 790
(8th Cir. 1995). Under the commerce clause, if a statute has extraterritorial reach it is considered per se invalid. Courts employ varying standards to define when a statute has "extraterritorial reach." See cases cited infra at 8-9. If a statute does not have extraterritorial reach, traditional dormant commerce clause analysis is applied to determine whether a particular regulation is invalid as discriminating against interstate commerce or as violating the applicable balancing test. Id., citing Maine v. Taylor, 477 U.S. 131
(1986); Bacchus Imports, Ltd. v. Dias, 468 U.S. 263 (1984); Hughes v.Oklahoma, 441 U.S. 322 (1979); and Pike v. Bruce Church, 397 U.S. 137
(1970). It is clear, however, that U.S. Supreme Court case law "does not establish that the states are forbidden categorically to regulate transactions that involve interstate commerce . . . [r]ather, states are permitted to regulate in-state components of interstate transactions so long as the regulation furthers legitimate state interests." Goldmen Co., Inc. v. New Jersey Bureau of Securities, 163 F.3d 780
(3rd Cir. 1999) (citing Hall v. Geiger-Jones Co.,242 U.S. 539 (1917) and other "Blue Sky" cases).
With regard to whether alleged extraterritorial application of state statutes violates the Due Process Clause, it has been stated that: "Under the Due Process Clause, a state may not restrict or control the obligation of contracts executed and to be performed outside of the state." Haisten v. Grass Valley Medical Reimbursement Fund, Ltd.,784 F.2d 1392 (9th Cir. 1986), citing Alaska Packers Assn. v.Industrial Accident Commission, 294 U.S. 532 (1935). It is clear, however, that " . . . with respect to interstate contractual obligations . . . parties who `reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to regulation and sanctions in the other State for the consequences of their activities." Burger King Corp. v. Rudzewicz,471 U.S. 462 (1985), citing Travelers Health Assn. v. Virginia,339 U.S. 643, 647 (1950) and McGee v. International Life Insurance Co.,355 U.S. 220, 222-223 (1957). See also, Aldens, Inc. v. Miller, 610 F.2d 538
(8th Cir. 1979).
The Travelers case cited above, discussing the Due Process Clause, is illustrative of this principle. In Travelers, an Association located in Nebraska engaged in the mail order insurance business with residents of Virginia. It had no actual offices *Page 6 
in Virginia and no paid agents in the state. The Virginia State Corporation Commission issued a cease and desist order to stop the further sale of insurance to Virginia residents until the Association complied with applicable Virginia law, which required the furnishing of information relating to its financial condition, consent to suit by service of process on the Secretary of the Commonwealth of Virginia, and the obtaining of a permit. The Association alleged that all of its activities took place in Nebraska, and that consequently, Virginia had no power under the Due Process Clause to reach it in a cease and desist proceeding to enforce any part of Virginia's regulatory law. The Association relied upon a previous case, Minnesota Commercial Men'sAssociation v. Benn, 261 U.S. 140 (1923), in which the Court held that a similar Minnesota mail-order insurer could not be sued in Montana courts absent its consent, where the insurance contracts, although mailed to Montana residents, were "executed and to be performed" in Minnesota. The Court in Travelers disagreed with the Association's argument and the applicability of the Benn precedent, holding that:
 . . . where business activities reach out beyond one state and create continuing relationships and obligations with citizens of another state, courts need not resort to a fictional "consent" in order to sustain the jurisdiction of regulatory agencies in the latter state. And in considering what constitutes "doing business" sufficiently to justify regulation in the state where the effects of the "business" are felt, the narrow grounds relied on by the Court in the Benn case cannot be deemed controlling.
 * * * . . . in Hoopeston Canning Co. v. Cullen, 318 U.S. 313, 316, we rejected the contention, based on the Benn case among others, that a state's power to regulate must be determined by a "conceptualistic discussion of theories of the place of contracting or of performance." Instead we accorded "great weight" to the "consequences" of the contractual obligations in the state where the insured resided and the "degree of interest" that state had in seeing that those obligations were faithfully carried out.
 * * * *Page 7 Measured by the principles of the Osborn, Hoopeston and International Shoe cases, the contacts and ties of appellants with Virginia residents, together with that state's interest in faithful observance of the certificate obligations, justify subjecting appellants to cease and desist proceedings under § 6. The Association did not engage in mere isolated or short-lived transactions. Its insurance certificates, systematically and widely delivered in Virginia following solicitation based on recommendations of Virginians, create continuing obligations between the Association and each of the many certificate holders in the state. Appellants have caused claims for losses to be investigated and the Virginia courts were available to them in seeking to enforce obligations created by the group of certificates. See International Shoe Co. v. Washington, supra, at 320.
Id. at 647-48.[1]
The Travelers Court thus held that "Virginia's subjection of this Association to the jurisdiction of that State's Corporation Commission in a § 6 proceeding is consistent with `fair play and substantial justice' and is not offensive to the Due Process Clause."[2]
It has been held under both the dormant commerce clause and the Due Process Clause that the technical place of execution of the contract does not necessarily control the issue. See, e.g., Goldmen Co., Inc.v. New Jersey Bureau of Securities, 163 F.3d 780 (3rd Cir. 1999) (stating, in response to a commerce clause challenge, that "[a]t one time, it was fashionable to conceive of contracts between *Page 8 
diverse parties as being rooted in a single geographical location, such as the place the offer was accepted," but noting that "[t]he contrasting modern approach is to recognize that contracts formed between citizens in different states implicate the regulatory interest of both states"); and Haisten v. Grass Valley Medical Reimbursement Fund, Ltd.,784 F.2d 1392 (9th Cir. 1986) (concluding, in analyzing a due process challenge, that the "formalities of contract formation and execution are not dispositive" and that "the test is not whether a foreign party does business in the regulating state, but rather, whether there is a sufficient connection between the object regulated and the forum state"). But see Dean Foods, Inc. v. Brancel, 187 F.3d 609
(7th Cir. 1999) (Wisconsin milk pricing regulation could not be applied to sale of milk from Wisconsin farmers where milk was not accepted by processor until it received milk in Illinois where contract was deemed to have been formed).
Courts have applied the applicable tests under the Commerce and Due Process Clauses to determine whether particular states can exercise regulatory power over certain interstate transactions. See, e.g., SPGGC,LLC. v. Blumenthal, ___ F.3d ___, 2007 WL 3036812 (2nd Cir. 2007) (Connecticut Gift Card Law did not violate dormant commerce clause as having impermissible extraterritorial reach because it could not be shown that its effects were projected into other states);Pharmaceutical Care Management Ass'n v. Rowe, 429 F.3d 294
(1st Cir. 2005) (Maine Unfair Prescription Drug Practices Act did not have extraterritorial reach under the dormant commerce clause because it did not give Maine any authority to determine whether a transaction in another state could occur at all); AdventureCommunications, Inc. v. Kentucky Registry of Election Finance,191 F.3d 429 (4th Cir. 1999) (Kentucky campaign reporting requirements could constitutionally apply under Due Process Clause to West Virginia radio and television stations who broadcast into Kentucky, solicited advertisements from Kentucky political candidates and received Kentucky tax dollars as revenue for political advertisements);Goldmen Co., Inc. v. New Jersey Bureau of Securities, supra
(application of New Jersey Securities Act to sales of securities from New Jersey to buyers in other states did not violate dormant commerce clause because transaction did not occur wholly outside New Jersey);Haisten v. Grass Valley Medical Reimbursement Fund, Ltd., supra
(application of California statute to insurance contract entered into and performed in the Cayman Islands did not give unconstitutional extraterritorial effect to California law under the Due Process Clause because of the contract's intended effects in California and that state's interest in the subject matter); Underhill Associates v.Bradshaw, 674 F.2d 293 (4th *Page 9 
Cir. 1982) (application of registration requirements of Virginia Securities Act to Nebraska securities dealers did not violate either dormant commerce clause or due process clause because transactions had sufficient contacts with Virginia and the Act regulated even-handedly);Cotto Waxo Co. v. Williams, supra (application of Minnesota petroleum-based sweeping compound sales ban to out-of-state corporation's sales was not "per s e" invalid as impermissibly extraterritorial because it did not require out-of-state company to conduct commerce according to Minnesota's terms, but proof was not sufficient to support summary judgment for Minnesota under the less stringent Pike balancing test); and Life Partners, Inc. v. Miller,420 F.Supp. 2d 452 (E.D.Va. 2006) (application of Virginia Viatical Settlements Act[3] to Texas viatical settlement provider was constitutional under dormant commerce clause where terminally ill patient entering viatical settlement resided in Virginia, never left that state, placed and received calls regarding the transaction from Virginia, received multiple settlement agreements sent by Texas corporation to her address in Virginia and signed the final agreement in Virginia). See also, Peter C. Felmly, Beyond the Reach of the States:The Dormant Commerce Clause, Extraterritorial State Regulation, and theConcerns of Federalism, 55 Me. L. Rev 467 (2003).
In the Life Partners case cited above involving viatical settlements, the conclusion was reached despite a "choice of law" provision stating that the agreement "was entered into in the State of Texas" and that Texas law would govern the construction, interpretation and legal effects of the agreement. The court in Life Partners stated that "[i]f this case were a dispute over the terms of the Agreement, [the choice of law provision] would clearly dictate that the law of Texas would control. . . . However, since the transaction touched both Virginia and Texas, it implicated the legislative interests of both states."Id. at 464. See also, Haisten, supra (choice of law provision selecting law of Cayman Islands not given effect where other facts indicated the purposeful directing of activities within California). Choice of law provisions contained in applicable contracts, therefore, although they may in many instances govern disputes arising between the parties as to the terms of the contract, do not dictate the extent of a state'sregulatory power over the transaction.[4] *Page 10 
It is apparent from the discussion above and the cases cited that the inquiry is fact-intensive. Although you have enclosed a sample copy of a "Request for Cash Advance" contract, I am not a fact-finder in the issuance of official Attorney General opinions. I cannot determine, from a bare review of the sample contract, whether the Arkansas Check-cashers Act is enforceable against the foreign corporation described in the contract. Detailed evidence as to the operations of the corporation and its agents or "servicers" in the state, and of the state's regulatory interest would be necessary to determine the matter. I will state, however, that in my opinion, the "choice of law" provision contained in the contract, the provision stating that the contract is between the customer and the foreign corporation and not between the customer and the "servicer," and the provision stating that the offer will either be approved or rejected by the foreign corporation at its out-of-state location, are not necessarily dispositive of the question.
Question 2 — I also am curious, provided that The Check Cashers Act of1999 is enforceable against such interest, if the Arkansas State Boardof Collection Agencies, by choosing nonetheless not to enforce the CheckCashers Act of 1999 against the interest, is exceeding its statutoryauthority.
As stated above, questions of fact arise as to whether the Arkansas Check-cashers Act is enforceable against individual foreign corporations. I cannot make this determination in a given instance. The applicable law has been set out above. I will note, however, that administrative officers and agencies are generally vested with discretion in the exercise of their powers and duties. See, e.g., 73 C.J.S. Public Law and Administrative Procedure § 124. It has also been stated that, subject to judicial review, administrative agencies are empowered to determine the limits of their own statutory authority.Id. at § 121. The applicable question in this regard is not, in my opinion, whether the Arkansas State Board of Collection Agencies is "exceeding" its authority by "not . . . enforc[ing] the Check Cashers Act of 1999" against certain foreign corporations, but rather, assuming the Board is not enforcing the Act against such entities, whether the Board is failing to exercise its authority to the fullest extent statutorily and constitutionally possible. Again, that underlying issue will depend upon the facts of a given case. In my opinion the Board is invested with a substantial measure of discretion in this regard. *Page 11 
Deputy Attorney General Elana C. Wills prepared the foregoing opinion, which I hereby approve.
Sincerely,
DUSTIN McDANIEL
Attorney General
[1] The Association appeared "specially" for the "sole purpose of objecting to the alleged jurisdiction" of the Virginia Corporation Commission and for the purpose of quashing summons served upon it by registered mail. Although it is somewhat unclear, this fact may have prompted the Court to limit its decision to a conclusion that Virginia had power to issue a cease and desist order enforcing "at least that regulatory provision requiring the Association to accept service of process by Virginia claimants on the Secretary of the Commonwealth").
[2] The test for the exercise of regulatory or "legislative" jurisdiction in such cases is similar to, but not exactly the same as the test for determining judicial or personal jurisdiction. Id. Seealso, Travelers, supra, Douglas, J. concurring (stating that a policyholder's ability to sue is not necessarily the measure of Virginia's power to regulate); Adventure Communications, 191 F.3d 429
(4th Cir. 1999); and RLH Industries, Inc. v. SBCCommunications, 133 Cal.App.4th 1277, 35 Cal. Rptr.3d 469
(2006).
[3] The court described the Act as "regulat[ing] the sale of life insurance policies by terminally-ill persons to third parties for less than the full amount of death benefits provided under the policy."Id. at 457.
[4] Of course, choice of law provisions do not always govern even the terms of the agreement between the parties. One exception is where application of the designated state's law would violate the fundamental public policy of the state with the most significant relationship to the transaction. See, e.g., Aldens, Inc. v. Miller, 610 F.2d 538
(8th Cir. 1979) (Illinois mail-order credit provider could be subjected to Iowa Consumer Credit Code despite provision in credit agreement stating that it was an Illinois contract governed by Illinois law).